UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,                        **REPORT AND**
                                                     **RECOMMENDATION**

   -against-

**WILLI REYES PELDOMO,**                               **10-CR-00069 (RRM) (ALC)**
**also known as "Juan A. Gomez-Perez" and**
**"Juan Antonio Gomez-Perez,"**

                Defendant.
-------------------------------------------------------------------X

**ANDREW L. CARTER, JR., UNITED STATES MAGISTRATE JUDGE:**

        On February 2, 2010, Defendant Willi Reyes Peldomo ("Defendant" or "Peldomo") was indicted for passport fraud, in violation of 18 U.S.C. § 1542, and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). On June 25, 2010, Defendant moved to suppress statements he made to the Department of State, Diplomatic Security Services ("DSS") during a meeting with his parole officer because those statements were allegedly obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Specifically, Defendant alleges that while the DSS agents interrogated him, he was in custody and the agents did not inform him of his *Miranda* rights. Defendant also alleges that the questioning was coercive and it violated his Fifth Amendment right against self-incrimination. On September 8, 2010, the Honorable Roslynn R. Mauskopf referred the matter to me for a Report and Recommendation. I held an evidentiary hearing on September 22, 2010 to assess the factual and legal issues raised in the papers. For the following reasons, I respectfully recommend that the Court deny Defendant's motion.

## I. Background

Special Agent Sokorai ("Sokorai") was the only witness at the evidentiary hearing, and I found him to be credible. Sokorai testified that he is employed with the Bureau of Diplomatic Security and he was assigned a passport fraud case in the name of Juan Antonio Perez. (Tr. 3:19-23, 6:13-21.) The subject had applied for a passport and the application was flagged for fraud. (Tr. 6:24-7:22.) The subject was later identified by the DSS as the Defendant. (Tr. 9:15-17, 19:25-21:9.) Agent Sokorai testified that DSS learned that Defendant was on parole in Pennsylvania and Agent Sokorai asked the parole officer if the DSS could interview Defendant during his parole meeting. (Tr. 9:4-10:10.) Agent Sokorai requested that the parole officer not inform Defendant that agents from the DSS would be at the meeting because the agent believed Defendant to be a flight risk based on his prior history. (Tr. 10:11-18, 25:20-26:25.) The parole meeting took place around the Thanksgiving holiday in 2009 and Agent Sokorai was present along with his partner, Special Agent Christopher Rex. (Tr. 10:19-11:3). Once Defendant arrived, there were five people present, two DSS special agents, two parole officers, and Defendant. (Tr. 29:8-18.) One of the parole officers was also the Spanish interpreter. (Tr. 29:19-22.)

Before the meeting began, the agents arranged the room in accordance with techniques they learned during their training. (Tr. 11:3-16.) Agent Sokorai described the interview room. (Tr. 28:13-29:7.) The agents and parole officers had their backs to the wall while interrogating Defendant. (Tr. 30:5-12.) The agents were not armed nor were they in uniform. (Tr. 12:9-10, 40:16-18.)

Agent Sokorai testified that, before the interview began, it was never the agents' intention to arrest Defendant, but the agents knew that making a false statement in a passport application is

a federal crime, which in turn is a violation of parole. (Tr. 12:16-23, 21:22-23:7.) When Defendant was escorted into the room, the agents immediately identified themselves. (Tr. 12:7-8.) Because the agents had pictures of Defendant before the interview, they were able to identify him as he walked into the room. (Tr. 33:1-34:23.) At the beginning of the meeting, the agents told Defendant that they were investigating a case of identity theft rather than passport fraud because they did not want to give Defendant an opportunity to prepare a statement. (Tr. 13:2-5.) Agent Sokorai testified that the defendant was willing to speak with the agents. (Tr. 13:12-16.) At the beginning of the interview, they asked for identifying documents from Defendant, such as a driver's license. (Tr. 13:7-11.) The agents conducted the interview and obtained the statements and information from Defendant relevant to the passport fraud charges. (Tr. 13:17-23.) Agent Sokorai testified that Defendant was cooperative throughout the interview; Defendant never asked he if he could stop talking. (Tr. 15:3-6.)

Initially, Defendant made a sworn written statement affirming that he was Juan Antonio Gomez-Perez, the individual identified in the passport application. (Tr. 13:24-14:3.) Once the agents presented their case to Defendant and revealed that they had information contrary to what he provided in the sworn statement, Agent Sokorai testified that Peldomo said "ok you got me." (Tr. 14:1-5.) Agent Sokorai was aware that Defendant was also admitting to a parole violation in front of his parole officer by applying for a passport. (Tr. 23:24-24:1.) After the admissions and several times during the interview, Defendant requested to be arrested. (Tr. 14:10-11.) Agent Sokorai testified that Defendant stuck his hands out in front of him, indicating that he wanted to be arrested. (Tr. 14:11-13.) The agents told him that they were not arresting him that day and they never told him that he was under arrest. (Tr. 14:6-13, 49:1-16.) Defendant gave the agents additional information after he admitted his true identity. (Tr. 15:7-21.) However, the agents did

not prompt Defendant to give them the additional information and the agents were not expecting to receive the information. (Tr. 15:22-16:2.)

The interview lasted between an hour and a half and two hours. (Tr. 14:14-15. 50:18-21.) Agent Sokorai testified that Defendant was free to leave during the course of the interview. (Tr. 25:1-2.) Defendant was never restrained and he was permitted to stand up during the interview. (Tr. 42:3-6.) Agent Sokorai testified that during the interview, Peldomo was permitted to have all his belongings with him, including his phone. (Tr. 14:16-20.) Defendant used his phone several times during the interview by making phone calls and text messaging. (Tr. 14:21-23, 47:1-20.) The agents asked him several times during the interview if he could refrain from using the phone because it was distracting. (Tr. 14:23-25, 47:1-9.) At one point, after Peldomo admitted that he was not truthful in his passport application, he called a person he claimed to be his wife and said something to the effect of "they finally got me, I'm going home." (Tr. 45:3-19.) During the interview, Defendant also used the bathroom. (Tr. 16:3-5.) Defendant was escorted to the bathroom by a parole officer because it is the policy at the parole office to escort individuals to the bathroom. (Tr. 16:6-11.)

After the agents obtained the information that they wanted, Defendant requested that the DSS allow him to purchase his own ticket to the Dominican Republic and leave that night. (Tr. 16:14-20.) The agents told him that they would not allow him to do so. (Tr. 16:20-21.) Peldomo subsequently asked to speak with an attorney. (Tr. 16:25-17:5.) At that point, the agents stopped the interview and did not ask him further questions. (Tr. 17:2-7.) However, following the interview, the parole officers arrested him for violating his parole based on the information provided during the interview. (Tr. 17:10-18, 38:7-12, 39:4-8.) Agent Sokorai testified that it was not his understanding that Defendant would be arrested and he first learned that Defendant

was going to be arrested at the end of the interview. (Tr. 17:19-25,) However, Agent Sokorai admitted that it was fair to assume that Defendant would be charged with a violation of parole and arrested because he was admitting to a crime during the course of the interview. (Tr. 37:18-38:6.) It is undisputed that throughout the interview, the agents never gave Peldomo *Miranda* warnings. (Tr. 18:11-19:8.)

## II. Discussion

Statements obtained through the custodial interrogation of an individual are inadmissible, unless law enforcement authorities administer *Miranda* warnings. Defendant argues that he endured custodial interrogation during the interview. He claims he was in a custodial setting under coercive pressure, *see Miranda*, 384 U.S. at 467; *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998), and therefore, his statements should be suppressed from the prosecution's case-in-chief. *See Michigan v. Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990); *Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003).

### A. Custodial Interrogation

Whether Defendants' statements must be suppressed will depend on whether he was in custody during the interview because *Miranda*'s warning requirements apply only to "custodial interrogation." *Miranda*, 384 U.S. at 444, 477; *accord Thompson v. Keohane*, 516 U.S. 99, 101-02, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995); *Parsad*, 337 F.3d at 181; *Tankleff*, 135 F.3d at 242. Custody exists if a reasonable person in that position would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. As the Court in *Tankleff* cited:

> [T]he test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.

> An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.

135 F.3d at 243-44 (*quoting United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (internal quotation marks and citations omitted)); *see also U.S. v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (holding that reversing the order of the inquiry cited in *Tankleff* would be more consistent with prior Supreme Court decisions.) In line with *Newton*, I will address these factors in reverse order.

### 1. Free to Leave Inquiry

The free-to-leave inquiry is the first step, but "not [a] determinative, first-step in establishing Miranda custody." *Newton*, 369 F.3d at 670. There are number of factors that a court examines when determining whether a reasonable person would feel that he can leave the situation. For example, courts look at "whether a suspect is or is not told that she is free to leave, the location and atmosphere of the interrogation, the language and tone used by [the agents], whether the suspect is searched, frisked, or patted down, and the length of the interrogation." *Tankleff*, 135 F.3d at 244 (internal citations omitted).

Here, the testimony elicited from the evidentiary hearing does not show that for the majority of the interview a reasonable person in Defendant's position would have thought that he was unable to leave. The agents repeatedly told him that he was not under arrest. Defendant was free to leave the interview, he was permitted to leave the room, he had all his belongings with him, and he frequently used his cell phone. The agents were not armed nor were they in uniform. The evidence does not show that the agents threatened him and the interview was not unreasonably long. When Defendant asked to speak with an attorney, the agents stopped their questioning.

However, I find that, at the point Defendant asked the agents if he could purchase a ticket to the Dominican Republic and was told that he could not, he was no longer free to leave for custody purposes.

### 2. Presence or Absence of Arrest-Like Restraints

In *Newton*, the Court articulated that if a court finds a reasonable person would have thought he was free to leave the meeting, the *Miranda* analysis stops. 369 F.3d at 672. However, if a court finds that at any point, a reasonable person was not able to leave the situation, a court must determine whether a "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id*. The "formal arrest" analysis is the "ultimate inquiry" for custody purposes. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)); *accord Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) ("In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (internal quotation marks and citations omitted)). The test again is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (internal quotation marks and citations omitted).

Here, I find that at no point during the interview could a reasonable person feel that he was in an arrest-like situation. *See, e.g*., *U.S. v. Groezinger*, 625 F. Supp. 2d 145, 158-59 (S.D.N.Y. 2009) (finding that though Defendant was not free to leave, his actions were not

curtailed or restrained as they would have been had he been under formal arrest); *U.S. v. Bossinger*, No. 06-CR-054A, 2007 WL 1791644, at *5-6 (W.D.N.Y. Jun. 20, 2007) (finding that the suspect was not in custody because while the suspect was not free to leave, she was not in a formal arrest situation). As I articulated above, he was permitted use his telephone as he wished, he was not handcuffed, and he had all his belongings with him. He was not frisked or patted down and he was not placed under arrest during the interview. The fact that he was escorted to the bathroom is insufficient to conclude that it was a formal arrest situation. Accordingly, I find that Defendant was free to leave up until his request to fly to the Dominican Republic was denied, but at no point during the interview do I find that he was under the type of restraint comparable to a formal arrest that triggers the necessity of *Miranda* warnings.

**B. Coercion**

Defendant claims that the questioning by the DSS agents was coercive and violated his Fifth Amendment right against self-incrimination. To determine whether the statements were voluntarily made, the court analyzes the totality of the circumstances surrounding law enforcement's conduct. *See U.S. v. Awan*, No. 07-CR-4315, 2010 WL 2348649, at *3 (2d Cir. Jun. 14, 2010) (citing *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988)). "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green*, 850 F.2d at 901-02. Here, I do not find that Defendant's statements were coerced. He spoke freely and voluntarily and appeared to cooperate throughout the interview. There is no indication that the agents used physical force, were threatening, or even raised their voices during the interrogation. While English is not Defendant's native

language, a parole officer acted as an interpreter and there is no evidence that Defendant had difficulty understanding the agents. Accordingly, I find that there is insufficient evidence warranting suppression of Defendant's statements from trial.

### III. Conclusion

For the reasons set forth above, I respectfully recommend that the Court deny Defendant's motion to suppress. Pursuant to 28 U.S.C. § 636(b) and Rule 59(a) of the Federal Rules of Criminal Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed on ECF. Requests for extensions of time to file objections should be directed to Judge Mauskopf. Failure to file timely objections will preclude appellate review of any order of judgment that will be entered.

**SO ORDERED**

**Dated: October 28, 2010**
      **Brooklyn, New York**

                                                _____/s_____
                                                **ANDREW L. CARTER, JR.**
                                                **UNITED STATES MAGISTRATE JUDGE**